UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JOSEPH LEE,**<br><br>    Plaintiff,<br><br>v.<br><br>**DISTRICT OF COLUMBIA,**<br><br>    Defendant. | Civil Action 09-cv-1832 (RC) |

**MEMORANDUM OPINION**

After he was fired from his job as a corrections officer with the District of Columbia Department of Corrections, Joseph Lee brought this suit alleging a failure to accommodate his diabetes, which required him to eat healthy meals at regular times, and intentional discrimination on the basis of disability. The District of Columbia has moved for summary judgment on both counts. Because a reasonable jury could find in favor of Mr. Lee, the court will deny the motion.

**I.  BACKGROUND**

Construed in the light most favorable to the plaintiff, the facts of this case are as follows. In 2008, Joseph Lee, a corrections officer assigned to guard inmates receiving treatment at Howard University Hospital, was fired by the District of Columbia Department of Corrections. The stated reason was neglect of duty. Def.'s Mot. for Summ. J. ("Def.'s Mot."), Ex. G (Letter from Devon Brown, Director, District of Columbia Department of Corrections, to Joseph Lee (June 26, 2008)) ("Brown Termination Letter") at 2–3.

At that time, Joseph Lee had Type II diabetes. Def.'s Mot., Ex. A (Dep. of Joseph Lee (May 17, 2011)) ("Lee Dep. (Def.)") at 110. He took oral medication to manage his disease, and

was required to monitor his blood sugar, exercise, and eat healthy meals at regular times. Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n"), Ex. A (Dep. of Joseph Lee (May 17, 2011)) ("Lee Dep. (Pl.)") at 110–14. If he did not manage his diabetes properly, he could get dizzy and faint or fall asleep. *Id.* at 115–16, 123. Mr. Lee[1] told several superiors within the Department of Corrections about his diabetes, including Kenneth Graham and Yvonne Perry. *Id.* at 58. He did not speak with the Department's disability coordinator—indeed, he did not know that the Department had a disability coordinator. *Id.* at 60.

In March 2008, Mr. Lee was assigned to work an overnight shift at Howard University Hospital; he went on duty at 11:30 p.m. and completed his shift at 8:00 a.m. According to the recollection of his supervisors, he was found asleep on the job three times in a little more than two weeks. Mr. Lee denies that he was ever asleep on the job.

Ms. Perry recalls that she found Mr. Lee sleeping at his post on March 12, 2008 and counseled him to be more attentive to his duties. Pl.'s Opp'n, Ex. G (Dep. of Yvonne Perry (Mar. 2, 2011)) ("Perry Dep.") at 62–65. Mr. Lee denies that Ms. Perry found him asleep. Lee Dep. (Pl.) at 117. Mr. Graham recalls that—on the following day, as Ms. Perry recalls, Perry Dep. at 66—a nurse called to say that a corrections officer was asleep on the job and could not be awoken, Pl.'s Opp'n, Ex. D (Dep. of Kenneth Graham (Aug. 12, 2011)) ("Graham Dep. (Pl.)") at 43, 119; Def.'s Mot., Ex. D (Dep. of Kenneth Graham (Aug. 12, 2011)) ("Graham Dep.

---

[1] Although the deponents in this case refer to each other as corporal, sergeant, lieutenant, and so on, those are informal titles used (somewhat inconsistently, from the appearance of the depositions) in the Department of Corrections. *See* Pl.'s Opp'n, Ex. B (Dep. of Mitchell Franks (May 5, 2011)) ("Franks Dep.") at 19–21. The formal job titles are correctional officer, lead correctional officer, and supervisory correctional officer. *Id.* at 21. The court will use simple honorifics to refer to Department employees who hold or held these positions.

(Def.)") at 119–20.  When Mr. Graham arrived at the hospital, he heard snoring and found Mr. Lee, who did not respond to his name, asleep in a chair.  Graham Dep. (Def.) at 119.  Mr. Graham has testified that he took a photograph of Mr. Lee,[2] then woke him up and told him that he was violating Department rules and regulations.  *Id.* at 119–20.  Mr. Graham recalls that, at the time, Mr. Lee denied being asleep, *id.* at 119; Mr. Lee continues to deny that he was asleep, Lee Dep. (Pl.) at 118.

Mr. Lee did not receive a lunch break on March 27, 2008, *id.*, as Ms. Perry admits could sometimes happen, Perry Dep. at 34.  He called Mr. Graham at about 2:15 a.m. to ask for a lunch break.  Lee Dep. (Pl.) at 119.  As Mr. Lee recalls, he said to Mr. Graham, "Sarg, you know I'm a diabetic.  I need my lunch break."  Mr. Lee says that Mr. Graham replied, "All right, Lee.  You're going to be all right.  Somebody is going to be coming around.  Just hold on and wait."  *Id.*

A little after 3:00 a.m., someone from the hospital called to report that Mr. Lee was sleeping on the job.  As Ms. Perry recalls, Mr. Graham took the call and ordered her to go to the hospital and find out what was going on.  Perry Dep. at 38, 41.  (Mr. Graham denies this.

---

[2] There is a great deal of confusion about this photograph in the record.  David Holmes, who supervised both Ms. Perry and Mr. Graham, recalls that they told him that Ms. Perry had taken the photograph on March 27, 2008; Mr. Holmes labeled the image accordingly.  Pl's Opp'n, Ex. C (Dep. of David Holmes (May 5, 2011)) ("Holmes Dep.") at 55–58.  Throughout the course of the review of the incident on that date, which ultimately led to Mr. Lee's termination, the photograph was discussed as having been "provided by Sgt. Perry."  *See* Def.'s Mot., Ex. F (Memorandum from Joseph Peters, Hearing Officer, to Devon Brown (June 20, 2008)) at 2; Brown Termination Letter at 1.  Ms. Perry denies having taken the picture, Perry Dep. at 56–57, 72–73, and Mr. Graham now says that he took it, Graham Dep. (Def.) at 119–20.  For his part, Mr. Lee claims that the picture must have been taken by a nurse at D.C. General Hospital in the late 1990s, judging by some details that he sees in the photograph and the fact that he believes that his superiors were not permitted to have cameras in the hospital.  Lee Dep. (Pl.) at 68–75.

Graham Dep. (Pl.) at 64.) On Ms. Perry's account, she went to the room where Mr. Lee and Warren Hairston, his partner on that shift, were stationed. Ms. Perry says that she entered the room and shook Mr. Lee, who awoke briefly and then went back to sleep. *Id.* at 43. She left the room and called Mr. Graham, who said that relief was on the way. *Id.* at 47. She wrote a report of the incident, which, along with the incidents earlier that month, became the stated reason that Cpl. Lee was fired. Perry Dep. at 78–80; Def.'s Mot., Ex. B (Official Report of Extraordinary Occurrence (Mar. 27, 2008)); Brown Termination Letter, at 2–3.[3]

Ms. Perry's account of that evening is contradicted by both Mr. Lee and Mr. Hairston. Mr. Lee says that he was not asleep that night. Lee Dep. (Pl.) at 118. He says that he denied being asleep at the time, and told Mr. Graham that Mr. Hairston could verify that he had not been asleep. *Id.* at 123. Mr. Hairston recalls that, when he saw Ms. Perry approaching on the morning of March 27, 2008, he went out into the hall to speak with her. Pl.'s Opp'n, Ex. F (Dep. of William Hairston (May 4, 2011)) ("Hairston Dep.") at 44–45. Ms. Perry, he says, "said something to Corporal Lee, and Lee looked up and nodded," then put his head down. Hairston Dep. at 45. She asked whether Mr. Lee was asleep; Mr. Hairston said that he was not asleep,

---

[3] Ms. Perry's original report was handwritten, Perry Dep. at 54; Graham Dep. (Pl.) at 80, and has evidently gone missing. In its place there is a typewritten report, signed by Ms. Perry and dated March 27, 2008 at 4:00 a.m. Def.'s Mot., Ex. B (Official Report of Extraordinary Occurrence (Mar. 27, 2008)). Ms. Perry says that the typewritten version substantially corresponds to her handwritten report, except that her original report did not mention the alleged incident in which Mr. Graham counseled Mr. Lee on March 13, 2008, Perry Dep. at 78, as the typewritten report does. It is not clear who generated the typewritten report and added the sentence about March 13. Ms. Perry and Mr. Graham both deny authorship, Perry Dep. at 54, 78; Graham Dep. (Pl.) at 80, but Ms. Perry appears (though the testimony is somewhat garbled) to admit that she signed it, Perry Dep. at 79–80. There seem to be no surviving reports by other witnesses to the March 27 incident (such as Mr. Lee and Mr. Hairston) although Ms. Perry and Mr. Graham both say that such reports would usually be generated, Perry Dep. at 80–81; Graham Dep. (Pl.) at 50–51, and Mr. Holmes says that he in fact received them, Holmes Dep. at 107.

that the two of them had been talking not long before.  *Id.* at 48.  Mr. Hairston says that Ms. Perry never entered the room where he and Mr. Lee were stationed, and that she did not (as she says) nudge Mr. Lee to wake him up.  *Id.* at 50.

Mr. Lee was placed on administrative leave, and then fired for neglect of duty.  Franks Dep., Ex. 7 (Letter from Devon Brown, Director, District of Columbia Department of Corrections, to Joseph Lee (Apr. 3, 2008)); Brown Termination Letter at 2–3.  After exhausting his administrative remedies, he filed this suit, alleging that the Department had failed to reasonably accommodate his diabetes by granting him regular lunch breaks, and had fired him because he was a diabetic.  The District of Columbia has moved for summary judgment on both claims.

## II.  LEGAL STANDARD

Summary judgment may be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if sufficient evidence exists such that a reasonable jury could return a verdict for the non-moving party.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  The moving party bears the initial responsibility of identifying those portions of the record which demonstrate the absence of any genuine issue of material fact.  *Id.* at 323; FED. R. CIV. P. 56(c)(1)(A) (noting that the movant

may cite to "depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials"). In response, the non-moving party must similarly designate specific facts in the record that reveal a genuine dispute that is suitable for trial. *Celotex*, 477 U.S. at 324.

On a motion for summary judgment, the court must "eschew making credibility determinations or weighing the evidence," *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-moving party, *Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

### III.  ANALYSIS

#### A.  The Americans with Disabilities Act

At the time relevant here,[4] the Americans with Disabilities Act barred discrimination against "a qualified individual with a disability because of the disability of such individual in regard to . . . the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (2006).[5] Claims of discrimination under

---

[4] The ADA Amendments Act of 2008, which took effect on January 1, 2009, Pub. L. No. 110-325, § 8, 122 Stat. 3533, 3559, does not apply to alleged discrimination occurring before that date, *Lytes v. D.C. Water & Sewer Auth.*, 572 F.3d 936, 939–42 (D.C. Cir. 2009); *see also Kapche v. Holder*, 677 F.3d 454, 461 n.7 (D.C. Cir. 2012) ("Because the conduct at issue preceded the ADA Amendments Act of 2008, the pre-amendment standards to determine liability govern here." (citing *Lytes*)).

[5] A "qualified individual with a disability" was defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (2006).

the ADA can take one of four forms: intentional discrimination (or "disparate treatment"), *e.g.*, *Swanks v. Wash. Metro. Area Transit Auth.*, 179 F.3d 929 (D.C. Cir. 1999), disparate impact, *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003), hostile work environment,[6] and failure to accommodate, *e.g.*, *Aka v. Wash. Hosp. Ctr.* 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc). When a plaintiff alleges intentional discrimination on the basis of disability, the defendant will usually assert that it acted "for reasons unrelated to the person's handicap." *Barth v. Gelb*, 2 F.3d 1180, 1186 (D.C. Cir. 1993) (discussing the Rehabilitation Act). Such "disparate treatment disability discrimination claim[s]" are analyzed "under the familiar three-part protocol set forth by the Supreme Court in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 [(1973)]." *Aka*, 156 F.3d at 1288; *see also Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999) ("*Aka* adopted for ADA claims *Barth*'s thorough analysis of the applicability of *McDonnell Douglas* to such claims in the Rehabilitation Act context."). The *McDonnell Douglas* test, in turn, focuses on the motives for an employer's action. Its first two steps, which shift the burden of production before a plaintiff must ultimately prove his case, are "designed to 'sharpen the inquiry' into an 'elusive' fact—an employer's discriminatory motivation." *Barth*, 2 F.3d at 1185 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 n.8 (1981)). As the D.C. Circuit has explained, *McDonnell-Douglas*'s "requirement of only a minimal prima facie showing strips the defendant of the ability to remain silent as to its motive while recognizing the plaintiff's ultimate obligation to prove that motive's illegality." *Id.* at 1186; *see also id.* (explaining that "the

---

[6] Although this circuit has not resolved the question, four circuits have found that hostile work environment claims are available under the ADA, *see Lanman v. Johnson County, Kansas*, 393 F.3d 1151, 1155 (10th Cir. 2004); *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 719 (8th Cir. 2003); *Flowers v. S. Reg'l Physician Servs., Inc.*, 247 F.3d 229, 232–35 (5th Cir. 2001); *Fox v. Gen'l Motors Corp.*, 247 F.3d 169, 175–77 (4th Cir. 2001).

*Burdine* three-step approach was designed to address" the need for an "inquiry into subjective facts" such as "the employing agency's true motivation").

When a disabled plaintiff alleges a failure to make a reasonable accommodation, however, he need not explain why his employer has failed to accommodate him. The failure to accommodate is itself discriminatory. The ADA "defines the term 'discriminate' to include 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business. . . .'" *Breen v. Dep't of Transp.*, 282 F.3d 839, 841 n.3 (D.C. Cir. 2002) (quoting 42 U.S.C. § 12112(b)(5)(A) (2000)). "Under the ADA's scheme, then, it is discriminatory for a covered employer to decline to take reasonable steps to accommodate an employee's disability, unless the steps in question 'would impose an undue hardship on the operation of the business' of the employer." *Aka*, 156 F.3d at 1300. "To make out a prima facie case of discrimination for failure to reasonably accommodate [under the ADA], [the] plaintiff must demonstrate by a preponderance of the evidence: (1) that she was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of her disability; (3) that with reasonable accommodation she could perform the essential functions of her job; and (4) that the employer refused to make such accommodations." *Etheridge v. FedChoice Federal Credit Union*, 789 F. Supp. 2d 27, 35 (D.D.C. 2011). The employer's motivation for refusing the accommodation plays no part in that analysis, and therefore reasonable-accommodation claims are "not subject to analysis under *McDonnell-Douglas*." *Aka*, 156 F.3d at 1288.

Joseph Lee alleges both a failure to accommodate and intentional discrimination. The District has moved for summary judgment on both claims, and the court will consider them in turn.

### B. Failure to Accommodate

The District argues that Mr. Lee is not disabled within the meaning of the ADA and, in the alternative, that it had no notice of his disability and need for an accommodation. At the relevant time, "disability" was defined to include "a physical or mental impairment that substantially limits one or more . . . major life activit[y]." 42 U.S.C. § 12012(2)(A) (2006). The Supreme Court had concluded that "these terms need to be interpreted strictly to create a demanding standard for qualifying as disabled." *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 197 (2002). To that end, the Court read "'substantially limits' . . . as requiring that a person be presently—not potentially or hypothetically—substantially limited in order to demonstrate a disability." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482 (1999). "A 'disability,'" in turn, "exist[ed] only where an impairment 'substantially limit[ed]' a major life activity, not where it 'might,' 'could,' or 'would' be substantially limiting if mitigating measures were not taken. A person whose physical or mental impairment [wa]s corrected by medication or other measures d[id] not have an impairment that presently 'substantially limit[ed]' a major life activity." *Id.* at 482–83; *see also id.* at 483 ("To be sure, a person whose physical or mental impairment is corrected by mitigating measures still has an impairment, but if the impairment is corrected it does not 'substantially limi[t]' a major life activity." (alteration in original)).

The District argues that because Mr. Lee could, at the time in question, manage his diabetes by eating three healthy meals a day, taking his medicine, and exercising, Lee Dep. (Pl.)

9

at 110–14, he was not "presently . . . substantially limited" by that disease, *see Sutton*, 527 U.S. at 482. The District cites an Eleventh Circuit decision that an insulin-dependent diabetic who "had to 'watch' what he eats and avoid certain foods—'mostly sugars'—because of his diabetes" but was otherwise unaffected by the disease was not substantially limited in any major life activity. *Collado v. United Parcel Serv., Co.*, 419 F.3d 1143, 1155 (11th Cir. 2005); *see also id.* ("On cross-examination . . . Collado admitted that as long as he is taking insulin he can eat and digest his food normally. He even admitted that his diabetes has not affected his lifestyle in any way.").

    The District's argument boils down to this: because Mr. Lee could manage his diabetes by eating meals at regular times, he was not disabled with the meaning of the ADA, and because he was not disabled within the meaning of the ADA, that statute did not require that the District allow him to eat meals at regular times. The argument almost refutes itself. The difference between *Collado* and this case is that the *Collado* plaintiff's diabetes was under control and, without a regular lunch break, Mr. Lee's was not. Mr. Lee needed regular meals to control his disease; without them, he had trouble staying alert. Lee Dep. (Pl.) at 115–16, 123. The fact that this substantial limitation "'might,' 'could,' or 'would'" have been obviated "if mitigating measures were . . . taken" does not mean that the District had no obligation to allow Mr. Lee to take those measures, and it does not change the fact that, when he missed meals, Cpl. Lee was "presently . . . substantially limited" by his diabetes. *See Sutton*, 527 U.S. at 482. A reasonable jury could therefore find that Mr. Lee was disabled within the meaning of the Americans with Disabilities Act.

The District next argues that it did not have notice of Mr. Lee's disability and need for regular lunch breaks. Such notice is an element of a failure-to-accommodate claim. *See Flemmings*, 198 F.3d at 861 ("An underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation which the defendant-employer has denied."); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999) ("[T]he employer must know of both the disability and the employee's desire for accommodations for that disability."); *Woodruff v. LaHood*, 777 F. Supp. 2d 33, 40 (D.D.C. 2011) ("The burden . . . lies with the disabled employee to request any needed accommodation."); *Evans v. Davis Mem'l Goodwill Indus.*, 133 F. Supp. 2d 24, 27 (D.D.C. 2000) ("It . . . lies with the disabled employee to request needed accommodation.").

Mr. Lee recalls having told his supervisors, including Ms. Perry and Mr. Graham, that he was a diabetic. Lee Dep. (Pl.) at 58. He has said that in early 2008 he "frequently requested that he be provided with a 'lunch break' to tend to his medical condition," but "his superiors frequently failed to relieve him of his post for a lunch break." Pl.'s Opp'n, Ex. E (Pl.'s Resp. to District of Columbia's First Interrogatories (Jan. 5, 2010)) ("Lee Resp.") at 5. Ms. Perry admits that officers sometimes did not receive their lunch breaks. Perry Dep. at 34. As Mr. Lee recalls, on March 27, 2008, he requested a lunch break from Mr. Graham, who knew that he was a diabetic, about ninety minutes before Ms. Perry says that she found him asleep. Lee Dep. (Pl.) at 119 ("A: The first time I called him was around two something in the morning. I'd say 2:15. . . . Q: What did you say to Sergeant Graham? A: I said, 'Sarg, you know I'm a diabetic. I need my

lunch break.' His response was, 'All right, Lee. You're going to be all right. Somebody is going to be coming around. Just hold on and wait.'").[7]

The District makes several arguments why all of this was not enough to allow a reasonable jury to find that the District had received notice of Mr. Lee's diabetes and his need for regular lunch breaks. It says that Mr. Lee only told his coworkers about his diabetes informally, that he did not request an accommodation in those conversations, that he did not provide any written documentation of his disease, and that he never contacted the disability coordinator. As to the first and third arguments, no formal communication or written documentation is required: the employee's request for a reasonable accommodation "'does not have to be in writing . . . or formally invoke the magic words "reasonable accommodation"'" as

---

[7] The District argues that the court should disregard Mr. Lee's recollections as self-serving testimony and credit only the accounts of his former supervisors. But "at the summary judgment stage, a judge may not make credibility determinations, weigh the evidence, or draw inferences from the facts—these are jury functions, not those of a judge ruling on a motion for summary judgment." *George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005). And, "as *George* points out, 'there is no rule of law that the testimony of a discrimination plaintiff, standing alone, can never make out a case of discrimination that could withstand a summary judgment motion.'" *Desmond v. Mukasey*, 530 F.3d 944, 964 (D.C. Cir. 2008) (quoting *George*, 407 F.3d at 414 (quoting *Weldon v. Kraft, Inc.*, 896 F.2d 793, 800 (3d Cir. 1990))); *see also Johnson v. Wash. Metro. Area Transit Auth.*, 883 F.2d 125, 128 (D.C. Cir. 1989), *abrogated on other grounds by Belton v. Wash. Metro. Area Transit Auth.*, 20 F.3d 1197 (D.C. Cir. 1994) (holding that "when a plaintiff's claim is supported solely by the plaintiff's own self-serving testimony, unsupported by corroborating evidence, *and undermined by other credible evidence*," such as physical evidence or disinterested witnesses, the plaintiff's testimony may be put aside (emphasis added)). There is no objective evidence (aside from the disputed photograph) of what occurred in March 2008, and no disinterested witnesses, but only Mr. Lee's word (and sometimes that of Mr. Hairston) against the recollections of Mr. Lee's former supervisors. The court cannot weigh that evidence. Moreover, those supervisors do not always dispute Mr. Lee's account. Nowhere in the materials before the court does Mr. Graham say that he was unaware of Mr. Lee's diabetes, or that the conversation that Mr. Lee recounts did not happen as he claims. "Although a jury may ultimately decide to credit the version of the events described by" the District "over that offered by [Mr. Lee], this is not a basis upon which a court may rest in granting a motion for summary judgment." *George*, 407 F.3d at 413; *accord Desmond*, 530 F.3d at 964.

long as it 'make[s] clear that the employee wants assistance for his or her disability.'" *Loya v. Sebelius*, 840 F. Supp. 2d 245, 259 n.14 (D.D.C. 2012) (quoting *Taylor*, 184 F.3d at 313); *accord Thompson v. Rice*, 422 F. Supp. 2d 158, 176 (D.D.C. 2006) ("The request for accommodation does not have to be formal, and the words 'reasonable accommodation' do not have to be used . . . .").

The District has a stronger argument that Mr. Lee did not make it clear that he wanted assistance for his disability. In his deposition, Mr. Lee said that he "d[id] not want to be classified as a special case," Lee Dep. (Def.) at 60, and admitted that when he told one superior about his diabetes, Mr. Lee did not expect him to take any action, *id.* at 90. But, on the evidence presented here, a reasonable jury could find that, on March 27, 2008 (and perhaps before) Mr. Lee requested a lunch break and told his direct superior—who knew about his diabetes, Lee Dep. (Pl.) at 58—that diabetes made the break medically necessary, but that Mr. Graham only told Mr. Lee to "hold on and wait," *id.* at 119, and never asked Mr. Lee for any information about his disease or the limitations that it imposed. "Once the employer knows of the disability and the employee's desire for accommodations," the employer has "the burden to request additional information that the employer believes it needs." *Taylor*, 184 F. Supp. 2d at 315; *accord Woodruff*, 777 F. Supp. 2d at 41. Mr. Graham did not engage with Mr. Lee's request at all—perhaps because he did not understand what a reasonable accommodation was or how the Department of Corrections dealt with such requests. *See* Graham Dep. (Pl.) at 21 (equating an accommodation with "temporary light duty status"); *id.* at 23 (discussing accommodations in the context of people who had been injured and were returning to work; admitting that he was unfamiliar with Department policies about requesting reasonable accommodations).

The question is a close one, especially given that a mere ninety minutes elapsed between the request and the incident that led to Mr. Lee's firing. Yet his account of the conversation with Mr. Graham suggests that that particular request was part of an ongoing dialogue about his diabetes. Mr. Lee recalls saying, "Sarg, you know I'm a diabetic. I need my lunch break." Lee Dep. (Pl.) at 119. A reasonable jury could decide that he meant "Sarg, you know that I'm a diabetic and that because I'm a diabetic I need my lunch break or I could get sick." The jury could deduce from that that there had been (as Mr. Lee says, Lee Resp. at 5) earlier conversations between Mr. Lee and Mr. Graham about Mr. Lee's diabetes and how it affected him. The jury could therefore conclude that Mr. Graham was on notice that Mr. Lee needed regular lunch breaks to control his diabetes.

The District's final argument that it lacked notice of Mr. Lee's need for an accommodation also fails. The District asserts that Mr. Lee could only request a reasonable accommodation through the disability coordinator; although at least one court has found that an employer *may* "requir[e] disabled employees seeking accommodations to comply with a fixed set of procedures" when requesting accommodations for their disabilities, *Edwards v. EPA*, 456 F. Supp. 2d 72, 103 (D.D.C. 2006), the District never suggests that it did so. And there is no such requirement in the statute or any regulation. A reasonable jury could therefore find that the District had notice both of Mr. Lee's disability and of his need for an accommodation.

### C. Intentional Discrimination

Mr. Lee alleges that he was fired not for neglecting his duty, which was the stated reason, but because he had diabetes. To prevail on that claim, he "must prove that he had a disability within the meaning of the ADA, that he was 'qualified' for the position with or without a

reasonable accommodation, and that he suffered an adverse employment action because of his disability." *Swanks*, 179 F.3d at 934.  The District first repeats its argument that Mr. Lee was not disabled within the meaning of the statute; the court has already rejected that argument.

The District makes one additional argument: that it has offered a legitimate, non-discriminatory reason for firing Mr. Lee—that he was repeatedly asleep on the job—and that no reasonable jury could find that reason to be pretextual.  But there is a genuine dispute of fact as to whether Mr. Lee was actually asleep as alleged.  To begin with, Mr. Lee denies being asleep on each of March 12, 13, and 27, 2008.  Lee Dep. (Pl.) at 117–18.  Mr. Hairston also says that Mr. Lee was not asleep on March 27, the day of the incident that led directly to Mr. Lee's termination, and moreover that Ms. Perry (who says that she found him asleep) has substantially misrepresented the encounter, which Mr. Hairston observed.  Hairston Dep. at 45–46, 48–50.  Although Ms. Perry says that hospital staff called to say that they had observed Mr. Lee sleeping that night, and that Mr. Graham took the call and instructed her to go find out what was going on, Perry Dep. at 38, 41, Mr. Graham denies having taken such a call or given such instructions, Graham Dep. (Pl.) at 64.

If the jury accepted Mr. Lee's and Mr. Hairston's account of the events of March 27, it would be left to decide what had happened on March 12 and 13.  Mr. Graham recalls taking a photograph that appears to show Mr. Lee asleep on March 13, but there is a great deal of confusion as to the source and date of this image, *see supra* note 2, and a jury could reasonably decide not to credit it.  Mr. Lee has offered nothing more than pat denials that he was asleep on either of those nights, *see* Lee Dep. (Pl.) at 117–18, against the detailed recollections of Mr. Graham and Ms. Perry, which largely agree, *see* Perry Dep. at 62–66; Graham Dep. (Def.) at

15

118–20; Graham Dep. (Pl.) at 43.  It would be more difficult for a reasonable jury to favor Mr. Lee's recollection of March 12 and 13, unless (perhaps) it decided that Ms. Perry's testimony had been discredited by its conflict with Mr. Hairston's as to the events of March 27.  But the jury would not need to reach even that conclusion, because the administrative mechanisms that led to Mr. Lee's firing were not triggered by the events of March 12 and 13.  If the jury concluded (as it could) that Mr. Lee had not been observed sleeping on March 27, it would be left to infer that something other than Mr. Lee's actions motivated Ms. Perry to make the report that led to his termination.  *See Aka*, 156 F.3d at 1292 (holding that "'no additional proof of discrimination is required' as a matter of course once a plaintiff has shown that a jury could reject the employer's proffered explanation" for firing a disabled employee (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 513 (1993))).

Although the decision to fire Mr. Lee was not made by Ms. Perry, *see* Perry Dep. at 38 ("I don't know the full scope of why he was terminated because I wasn't privy to that information."),  that decision depended entirely on (and was the foreseeable consequence of) her decision to file a report that he had been asleep on the job.  A jury could conclude that her testimony (at least as to the events of March 27) was not credible, and therefore infer that her report was motivated by discriminatory animus and made with the intention to get Mr. Lee fired.[8]  That conclusion could be bolstered by the fact that no contemporaneous report of the

---

[8] That is, a reasonable jury could conclude that Ms. Perry had employed the formal decisionmakers as "the conduit of [her] prejudice—[her] cat's paw." *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990).  Applying a different anti-discrimination statute, the Supreme Court has held that "cat's paw" claims are viable: "if a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable" for intentional discrimination.  *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1194 (2011)

March 12 and March 13 incidents (which were discussed in the March 27 report) has been produced. And it would not necessarily be undermined by the fact that Mr. Lee chose to defend himself in the termination proceedings by arguing that he had done nothing wrong, *see* Def.'s Mot., Ex. H (Letter from John Rosser on Behalf of Joseph Lee to Joseph Peters, Hearing Officer (May 20, 2008)), and not that his diabetes had made him inattentive to his duties, or that the Department was motivated by a discriminatory purpose.

The District is therefore wrong to argue that no reasonable jury could reject as pretextual its explanation that it fired Mr. Lee because he was clearly, repeatedly, asleep on the job. To the extent that the District attempts to make other arguments in its reply brief, the court declines to consider them, nor will it read them into the one-paragraph argument offered in the District's main brief.

## IV.  CONCLUSION

For the reasons discussed above, the court will deny the District of Columbia's motion for summary judgment.

Rudolph Contreras<br>United States District Judge

Date: February 1, 2013

---

(footnote omitted); *see also id.* at 1190 n.1 (recounting the fable of the "cat's paw").